**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHIA CHIH HSU, derivatively on behalf of UPSTART HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DAVID GIROUARD, SANJAY DATTA, JEFF HUBER, KERRY COOPER, SUKHINDER SINGH CASSIDY, HILLIARD TERRY, MARY HENTGES, CIARAN O'KELLY, PAUL GU, and ROBERT SCHWARTZ <br><br> Defendants, <br><br> and <br><br> UPSTART HOLDINGS, INC., <br><br> Nominal Defendant. | C.A. No. <br><br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Chia Chih Hsu ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Upstart Holdings, Inc. ("Upstart" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants David Girouard, Sanjay Datta, Jeff Huber, Kerry Cooper, Sukhinder Singh Cassidy, Hilliard Terry, Mary Hentges, Ciaran O'Kelly,  Paul Gu, and Robert Schwartz (collectively, the "Individual Defendants," and together with Upstart, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Upstart and for violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This shareholder derivative action seeks to remedy wrongdoing committed by Upstart's officers and directors from March 18, 2021 to May 9, 2022, both dates inclusive (the "Relevant Period").

2.     Upstart is an Ohio-based financial technology company that provides artificial intelligence-backed loans. Through working in conjunction with banks, Upstart purports that its artificial intelligence ("AI") analyzes consumers' creditworthiness on a far more accurate scale than traditional loan underwriting, producing higher loan approval rates, lower loss rates, and a high level of automation.

3.     Upstart's loans are normally extended through its website or the Company's partner bank websites. Loans are also usually kept off the Company's balance sheet, which indicated to investors that Upstart's securities were a largely safe bet because the Company's financial wellbeing was not directly related to recouping the loans it issued.

4.     Indeed, Upstart regularly touted its AI superiority in identifying quality creditworthiness to investors.

5.     However, during the Relevant Period, Upstart issued poorly assessed loans to consumers because the Company's AI software was incapable of addressing macroeconomic changes in the economy, such as the injection of COVID-19 stimulus money provided by the federal government. Consequently, Upstart began underwriting loans with low creditworthiness.

6.     On May 9, 2022, the Company announced first quarter earnings which revealed that the amount of loans on the Company's balance sheet had more than doubled in just one quarter. During the announcement, Chief Financial Officer ("CFO") Sanjay Datta ("Datta") said the "balance of loans, notes, and residuals at the end of the quarter was…up to $604 million from $261 in Q4." Defendant Datta attributed the influx of loans to "rising interest rates and rising consumer delinquencies putting downward pressure on conversion."

7.     Defendant Datta attempted to explain away the discrepancy on Upstart's balance sheet by stating "historically [Upstart's] balance sheet has been almost exclusively for the purposes of "R&D." However, Defendant Datta said that in the first quarter of 2022, Upstart used the balance sheet "to do…sort of a market clearing mechanism." He went on to say that the Company "started to selectively use [its] capital as a funding buffer for core personal loans in periods of interest rate fluctuation where the market clearing price is in flux."

8.     Upstart's first quarter of 2022 report also revealed that the Company "loosened" its loan modification policy so that customers at risk of forbearance or in forbearance could be considered current. As a result, loans classified as "delinquent" could be reclassified as "current," thereby disguising Upstart's bleak financial status to investors.

9.     At the same time, the Company shrunk its revenue forecast by $150 million for the second quarter of 2022. These new figures fell well under accepted analysts' projections.

10.     Almost immediately, analysts began dismissing Defendant Datta's justification for the sharp increase in balance sheet activity. One analyst stated this behavior constituted a "divergence" from Upstart's "capital-light" business model that revealed Upstart had "few alternatives other than to hold more loans due to funding issues."

11.     On this news, the price of the Company's stock fell through the floor, dropping from $77.13 per share at the close of trading on May 9, 2022, to $33.61 per share at the close of trading on May 10, 2022, representing a loss in value of over 56%.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper loan approval practices, and by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's AI loan underwriting model lacked the ability to account for relevant considerations that impacted creditworthiness; (2) consequently, the Company's conversion rate suffered; (3) Upstart also began heavily relying on its balance sheet to finance loans, thereby exposing it to high credit risk; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Upstart's public statements were materially false and misleading at all relevant times.

13.     In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact.

14.     In yet further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

15.     Moreover, during the Relevant Period, five of the Individual Defendants breached their fiduciary duties by engaging in insider sales for proceeds of over $375 million

16.     In light of the Individual Defendants' misconduct, which has subjected the Company, its co-founder and Chief Executive Officer ("CEO"), and its CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Ohio (the "Class Action"), the need to undertake internal investigations and the need to implement adequate internal controls, the Company will have to spend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors,  of the substantial likelihood of the directors' liability in this derivative action and of certain directors' and officers' liability in the Class Action, and of their not being disinterested and/or independent directors, a majority of Upstart's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15. U.S.C. § 78n(a)(1)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

22.     Plaintiff Chia Chih Hsu is a current Upstart shareholder who has continuously held Upstart common stock at all relevant times.

**Defendant Girouard**

23.     Defendant Dave Girouard ("Girouard") is and has been a co-founder of Upstart, the CEO of the Company, and an Upstart director for the entirety of Upstart's existence. As of March 15, 2022, Defendant Girouard owned 12,469,877 shares of the Company's common stock. Therefore, Defendant Girouard owned 14.46% of the total common outstanding stock of the Company at that time. At the close of trading on March 15, 2022, Upstart's stock price was $97.48 per share. Thus, Defendant Girouard owned approximately $1,215,563,610 worth of Upstart stock.

24.     Defendant Girouard also engaged in insider trading during the Relevant Period, netting proceeds in excess of $207 million. His insider sales are as follows:

- On September 1, 2021, Defendant Girouard sold 137,498 shares at an average price per share of $225.71 for net proceeds of $31,034,811;

- On October 1, 2021, Defendant Girouard sold 12,498 shares at an average price per share of $309.23 for net proceeds of $3,864,806;

- On October 1, 2021, Defendant Girouard sold 125,000 shares at an average price per share of $300.32 for net proceeds of $37,540,625;

- On November 1, 2021, Defendant Girouard sold 12,498 shares at an average price per share of $330.56 for net proceeds of $4,131,326;

- On November 1, 2021, Defendant Girouard sold 125,000 shares at an average price per share of $333.92 for net proceeds of $41,739,750;

- On December 1, 2021, Defendant Girouard sold 12,498 shares at an average price per share of $202.55 for net proceeds of $2,531,419;

- On December 1, 2021, Defendant Girouard sold 125,000 shares at an average price per share of $192.82 for net proceeds of $24,102,500;

- On January 3, 2022, Defendant Girouard sold 91,665 shares at an average price per share of $150.38 for net proceeds of $13,784,857;

- On February 1, 2022, Defendant Girouard sold 91,665 shares at an average price per share of $109.40 for net proceeds of $10,028,059;

- On March 1, 2022, Defendant Girouard sold 133,038 shares at an average price of $158.33 per share for net proceeds of $21,063,507;

- On April 1, 2022, Defendant Girouard sold 91,665 shares at an average price of $108.67 per share for net proceeds of $9,960,777;

- On May 2, 2022, Defendant Girouard sold 45,833 shares at an average price of $80.00 per share for net proceeds of $3,666,640; and

- On May 2, 2022, Defendant Girouard sold 45,833 shares at an average price of $80.00 per share for net proceeds of $3,666,640.

**Defendant Datta**

25.    Defendant Datta is and has been Upstart's CFO since December 2016. As of March 15, 2022, Defendant Datta owned 1,067,712 shares of the Company's common stock. At the close of trading on March 15, 2022, the price of Upstart stock was $97.48 per share. Thus, Defendant Datta owned approximately $104,080,566 worth of Upstart stock.

**Defendant Huber**

26.    Defendant Jeff Huber ("Huber") is and has been a director of Upstart since June 2021. Defendant Huber is a member of the Nominating and Corporate Governance Committee. As of March 15, 2022, Defendant Huber owned 102 shares of the Company's common stock. At the close of trading on March 15, 2022, Upstart's stock price was $97.48 per share. Thus, Defendant Huber owned approximately $9,943 worth of Upstart stock.

**Defendant Cooper**

27.    Defendant Kerry Cooper ("Cooper") is and has been a director of Upstart since March 2021. Defendant Cooper is also the Chair of the Compensation Committee. As of March 15, 2022, Defendant Cooper owned 2,474 shares of the Company's common stock. At the close of trading on March 15, 2022, Upstart's stock price was $97.48 per share. Thus, Defendant Cooper owned approximately $241,166 worth of Upstart stock.

**Defendant Cassidy**

28.    Defendant Sukhinder Singh Cassidy ("Cassidy") is and has been a director of Upstart since February 2020. Defendant Cassidy is also the Chair of the Compensation Committee. As of March 15, 2022, Defendant Cassidy owned 123,729 shares of the Company's common stock. At the close of trading on March 15, 2022, Upstart's stock price was $97.48 per share. Thus,

Defendant Cassidy owned approximately $12,061,103 worth of Upstart stock.

29.     Defendant Cassidy also engaged in insider trading during the Relevant Period, netting proceeds of $1,058,800. Her insider sale is as follows:

- On November 19, 2021, Defendant Cassidy sold 5,000 shares at an average price per share of $211.76 for net proceeds of $1,058,800.

**Defendant Terry**

30.     Defendant Hilliard Terry ("Terry") is and has been a director of Upstart since February 2019. Defendant Terry is also the Chair of the Audit Committee. As of March 15, 2022, Defendant Terry owned 68,295 shares of the Company's common stock. At the close of trading on March 15, 2022, Upstart's stock price was $97.48 per share. Thus, Defendant Terry owned approximately $6,657,397 worth of Upstart stock.

31.     Defendant Terry also engaged in insider trading during the Relevant Period, netting proceeds of $15,342,780. His insider sale is as follows:

- On November 11, 2021, Defendant Terry sold 60,000 shares at an average price per share of $255.71 for net proceeds of $15,342,780.

**Defendant Hentges**

32.     Defendant Mary Hentges ("Hentges") is and has been a director of Upstart since December 2019. Defendant Hentges also is a member of the Audit Committee. As of March 15, 2022, Defendant Hentges owned 98,295 shares of the Company's common stock. At the close of trading on March 15, 2022, Upstart's stock price was $97.48 per share. Thus, Defendant Hentges owned approximately $9,581,797 worth of Upstart stock.

33.     Defendant Hentges also engaged in insider trading during the Relevant Period, netting proceeds of $7,486,500. Her insider sale is as follows:

- On November 15, 2021, Defendant Hentges sold 30,000 shares at an average price per share of $249.55 for net proceeds of $7,486,500.

**Defendant O'Kelly**

34.　Defendant Ciaran O'Kelly ("O'Kelly") is and has been a director of Upstart since April 2018. Defendant O'Kelly also is the Chair of the Nominating and Corporate Governance Committee and is a member of the Audit Committee. As of March 15, 2022, Defendant O'Kelly owned 192,745 shares of the Company's common stock. At the close of trading on March 15, 2022, Upstart's stock price was $97.48 per share. Thus, Defendant O'Kelly owned approximately $18,788,783 worth of Upstart stock.

**Defendant Gu**

35.　Defendant Paul Gu ("Gu") is and has been a co-founder of Upstart, the Senior Vice President of Product and Data Science, and a Company director since April 2015. As of March 15, 2022, Defendant Gu owned 1,699,716 shares of the Company's common stock. At the close of trading on March 15, 2022, Upstart's stock price was $97.48 per share. Thus, Defendant Gu owned approximately $ 165,688,316 worth of Upstart stock.

36.　Defendant Gu also engaged in insider trading during the Relevant Period, netting proceeds in excess of $143 million. His insider sales are as follows:

- On August 16, 2021, Defendant Gu sold 155,000 shares at an average price per share of $201.52 for net proceeds of $31,234,980;

- On September 15, 2021, Defendant Gu sold 155,000 shares at an average price per share of $269.75 for net proceeds of $41,810,940;

- On October 15, 2021, Defendant Gu sold 155,000 shares at an average price per share of $391.48 for net proceeds of $60,679,400;

- On November 15, 2021, Defendant Gu sold 39,000 shares at an average price per share of $246.94 for net proceeds of $9,630,660; and

- On March 1, 2022, Defendant Gu sold 2,000 shares at an average price per share of $160.01 for net proceeds of $320,028.

**Defendant Schwartz**

37.     Defendant Robert Schwartz ("Schwartz") was a director of Upstart from June 2015 until he resigned on November 15, 2021.

**Nominal Defendant Upstart**

38.     Upstart is a Delaware corporation with its principal executive offices at 711 N. High St., Columbus, Ohio 43215.  Upstart's shares trade on the NASDAQ under the symbol "UPST."

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

39.     Upstart began in 2012 with the intention to disrupt the traditional credit-approval process for personal and automobile loans. The Company intended to build a fully automated creditworthiness analyzing AI system to prevent loan default. Upstart became a public company approximately eight years after its founding through an initial public offering on December 16, 2020.

40.     Upstart charges fees on the loans it approves, either on a dollar or percentage basis. Upstart also charges referral fees and platform fees to its banking partners.  Referral fees are paid after a loan is given to a certain bank and platform fees are paid when a bank's loan originates on the Upstart platform, or website.

41.     Upstart finances loans from three sources for "Upstart-powered loans." First, Upstart prefers, and indeed does, fund most of its loans through its partner banks. These loans are held on the banks' balance sheets. Second, loans that are not held on banks' balance sheets are

funded by securities, namely through institutional investor investment. Third, if banks and institutional investors refuse to hold the loans, Upstart funds the loans from its own balance sheet.

42.     During the Relevant Period, Upstart publicly maintained and represented to investors in its SEC filings that the Company faced minimal credit risk from "Upstart-powered loans" since the "percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors has generally increased."

**Materially False and Misleading Statements Issued During the Relevant Period**

43.     On March 17, 2021, after the market closed, Upstart released its fourth quarter and full year results for 2020. During the conference call which announced these results, Defendant Girouard said: "Upstart is a fee-based business. We don't make loans, and we aren't exposed to material balance sheet risk." Defendant Datta added that "in terms of loan assets, we carried an aggregate balance of loans, notes, and residuals of $98 million at the end of 2020, down from $266 million at the end of 2019, reflecting the continued reduction of platform loans funded through our own balance sheet." Defendant Datta further doubled down on the conviction that Upstart was a low-credit risk, saying the loans on the Company's balance sheet "represent the totality of direct exposure to credit risk."

44.     Almost two months later, on May 11, 2021, Upstart held another conference call with analysts and investors to discuss the Company's concurrent release of its financial results for the first quarter of 2021. Defendant Girouard stated that the Company's success was "primarily technology and model-driven, which manifests as increasing conversion rates in our borrower funnel."

45.     Upstart's "conversion rate" figure is "the number of loans transacted in a period divided by the number of rate inquires received that [the Company] estimate[s] to be legitimate."

46.     While on the call, Defendant Datta referenced the Company's "conversion rate of 22% on rate requests, up from 14% over the prior year." Defendant Datta continued, suggesting the amount of loans on the Company balance sheet was shrinking:

> [The Company] carried an aggregate balance of loans, notes, and residuals of $73.2 million, down from $227.5 million at the end of the same quarter in the prior year. **This reflects the continuing reduction in the percentage of platform loans funded through our own balance sheet.** It's highlighted during our last earnings call these loans assets represent the totality of the direct exposure to credit risk.

(Emphasis added.)

47.     On June 9, 2021, while attending Bank of America's Global Technology Conference, Defendant Girouard compared Upstart to a "subprime lender lending off your balance sheet," saying "they are balance sheet lenders which have their own limits." He then suggested that the Company's revenues are not linked to "anything related to quality of credit performance." In answering a question posed by Bank of America analyst Nat Schindler on how the Company would "respond to a change in the credit cycle?," Defendant Girouard confidently replied "we will handle that recession far better than a traditional system would" and Upstart has "a great proof point that a model like ours actually can handle disruptions in the economy and dislocations better than a standard model."

48.     On August 10, 2021, Upstart held a conference call with analysts and investors to discuss the Company's concurrent release of its financial results for the second quarter of 2021. During the call, Defendant Datta spoke about the health of the Company's balance sheet, saying "[i]n terms of loans assets, we carried an aggregate balance of loans, notes, and residuals of $95.3 million, up from $73.2 million in Q1 and down from $148 million at the end of the same quarter in the prior year." He brushed this fact off by stating, "these loan assets represent the totality of the direct exposure we have to credit risk."

49.     On November 9, 2021, Upstart released its financial results for the third quarter of

2021. The press release announced, in relevant part:

**Third Quarter Relevant 2021 Financial Highlights**

- **Revenue**. Total revenue was $228 million, an increase of 250% from the third quarter of 2020. Total fee revenue was $210 million, an increase of 235% year-over-year.
- **Transaction Volume and Conversion Rate**. Bank Partners originated 362,780 loans, totaling $3.13 billion, across our platform in the third quarter, up 244% from the same quarter of the prior year. Conversion on rate requests was 23% in the third quarter of 2021, up from 15% in the same quarter of the prior year. Beginning in the third quarter of 2021, in order to better reflect actual conversions, we removed rate inquiries identified by our platform as likely fraudulent from our Conversion Rate calculation. Please see the section titled "Key Operating Metrics" below for further detail on the calculation and related information about prior periods.
- **Income from Operations**. Income from operations was $28.6 million, up from $12.2 million the prior year.
- **Net Income and EPS**. GAAP net income was $29.1 million, up from $9.7 million in the third quarter of 2020. Adjusted net income was $57.4 million, up from $12.3 million in the same quarter of the prior year. Accordingly, GAAP diluted earnings per share was $0.30, and diluted adjusted earnings per share was $0.60 based on the weighted-average common shares outstanding during the period.
- **Contribution Profit**. Contribution profit was $95.9 million, up 184% from in the third quarter of 2020, with a contribution margin of 46% compared to a 54% contribution margin in the same quarter of the prior year.
- **Adjusted EBITDA**. Adjusted EBITDA was $59.1 million, up from $15.5 million in the same quarter of the prior year. The third quarter 2021 adjusted EBITDA margin was 26% of total revenue, up from 24% in the third quarter of 2020.

**Financial Outlook**

For the fourth quarter of 2021, Upstart expects:
- **Revenue** of $255 to $265 million
- **Contribution Margin** of approximately 47%
- **Net Income** of $16 to $20 million
- **Adjusted Net Income** of $48 to $50 million
- **Adjusted EBITDA** of $51 to $53 million
- **Basic Weighted-Average Share Count** of approximately 81.9 million shares
- **Diluted Weighted-Average Share Count** of approximately 96.7 million shares

50.     During the conference call with analysts and investors that reviewed Upstart's third quarter of 2021's financial performance, Defendant Datta referenced an increase in the "aggregate balance loans, notes and residuals of $140 million," which was "up from $95.3 million in Q3 and down from $145 million at the end of the same quarter in the prior year." Defendant Datta refused to attribute the increase to Upstart approving loans with poor creditworthiness and instead blamed it on Upstart's "**use of our balance sheet to the scaling of our growing auto product, as well as our expansion into lower-credit score segments of personal lending**." (Emphasis added.)

51.     Three days later, on November 12, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2021. The 10-Q stated, "Upstart-powered loans are originated in reliance on the fact that our bank partners are the 'true lenders' for such loans."

52.     The 10-Q also spoke about the capabilities of the Company's AI system:

**If we are unable to continue to improve our AI models or if our AI models contain errors or are otherwise ineffective, our growth prospects, business, financial condition and results of operations would be adversely affected.**

Our ability to attract potential borrowers to our platform and increase the number of Upstart-powered loans will depend in large part on our ability to effectively evaluate a borrower's creditworthiness and likelihood of default and, based on that evaluation, offer competitively priced loans and higher approval rates. Further, our overall operating efficiency and margins will depend in large part on our ability to maintain a high degree of automation in our loan application process and achieve incremental improvements in the degree of automation. If our AI models fail to adequately predict the creditworthiness of borrowers due to the design of our models or programming or other errors, and our AI models do not detect and account for such errors, or any of the other components of our credit decision process fails, we may experience higher than forecasted loan losses. Any of the foregoing could result in sub-optimally priced loans, incorrect approvals or denials of loans, or higher than expected loan losses, which in turn could adversely affect our ability to attract new borrowers and bank partners to our platform, increase the number of Upstart-powered loans or maintain or increase the average size of loans facilitated on our platform.

Our AI models also target and optimize other aspects of the lending process such as borrower acquisition, fraud detection, default timing, loan stacking, prepayment timing and fee optimization, and our continued improvements to such models have allowed us to facilitate loans inexpensively and virtually instantly with a high degree of consumer satisfaction and with an insignificant impact on loan performance. However, such applications of our AI models may prove to be less predictive than we expect, or than they have been in the past, for a variety of reasons, including inaccurate assumptions or other errors made in constructing such models incorrect interpretations of the results of such models and failure to timely update model assumptions and parameters. **Additionally, such models may not be able to effectively account for matters that are inherently difficult to predict and beyond our control, such as macroeconomic conditions, credit market volatility and interest rate fluctuations, which often involve complex interactions between a number of dependent and independent variables and factors. Material errors or inaccuracies in such AI models could lead us to make inaccurate or suboptimal operational or strategic decisions, which could adversely affect our business, financial condition and results of operations.**

Additionally, errors or inaccuracies in our AI models could result in any person exposed to the credit risk of Upstart-powered loans, whether it be us, our bank partners or investors in our loan funding programs, experiencing higher than expected losses or lower than desired returns, which could impair our ability to retain existing or attract new bank partners and investors to participate in our loan funding programs, reduce the number, or limit the types, of loan bank partners and investors are willing to fund, and limit our ability to increase commitments under our warehouse and other debt facilities. Any of these circumstances could reduce the number of Upstart-powered loans and harm our ability to maintain a diverse and robust loan funding program and could adversely affect our business, financial condition and results of operations.

(Emphasis added.)

53.     On February 15, 2022, the Company published a press release revealing its financial results for the fourth quarter of 2021 and the full fiscal year of 2021, which ended December 31, 2021. The press released stated, in relevant part:

**Full Year 2021 Financial Highlights**

- **Revenue.** Total revenue was $849 million, an increase of 264% from 2020. Total fee revenue was $801 million an increase of 251% year-over-year.
- **Transaction Volume and Conversion Rate.** Bank partners originated 1.3 million loans, totaling $11.8 billion, across our platform in 2021, up 338% from the prior year. Conversion on rate requests was 24% in 2021, up from 15% in the prior year.

- **Income from Operations.** Income from operations was $141 million, up from $11.8 million the prior year.
- **Net Income and EPS.** GAAP net income was $135 million, up from $6.0 million in 2020. Adjusted net income was $224 million, up from $17.5 million in the prior year. Accordingly, GAAP diluted earnings per share was $1.43, and diluted adjusted earnings per share was $2.37 based on the weighted-average common shares outstanding during the period.
- **Contribution Profit.** Contribution profit was $398 million, up 279% from 2020, with a contribution margin of 50% compared to a 46% contribution margin in the prior year.
- **Adjusted EBITDA.** Adjusted EBITDA was $232 million, up from $31.5 million in the prior year. Full year 2021 adjusted EBITDA margin was 27% of total revenue, up from 13% in 2020.

**Financial Outlook**

For the first quarter of 2022, Upstart expects:

- **Revenue** of $295 to $305 million
- **Contribution Margin** of approximately 46%
- **Net Income** of $18 to $22 million
- **Adjusted Net Income** of $50 to $52 million
- **Adjusted EBITDA** of $56 to $58 million
- **Basic Weighted-Average Share Count** of approximately 84.3 million shares
- **Diluted Weighted-Average Share Count** of approximately 95.9 million shares

For the full year 2022, Upstart expects:

- **Revenue** of approximately $1.4 billion
- **Contribution Margin** of approximately 45%
- **Adjusted EBITDA** of approximately 17%

54.     On the same day, February 15, 2022, Defendant Datta told investors in a conference call  that Upstart was "cognizant of the fluidity in the macro environment," but maintained the Company was "not expecting any meaningful adverse impact from rising defaults on our volumes or economics." Defendant Datta touted that Upstart had "$170 million [that] was reinvested back into our balance sheet in the form of loans made in support of new R&D programs" and that the

"balance of loans, notes and residuals at the end of the year was $261 million, up from $140 million in Q3 and reflecting the accelerated pace of R&D."

55.     Three days later, on February 18, 2022, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2021 ("2021 10-K"), which reiterated the statements made during the February 15, 2022 conference call. Specifically, the 2021 10-K stated that "[l]oans issued through [its] platform can be retained by [Upstart's] originating bank partners, distributed to our broad base of institutional investors and buyers that invest in Upstart-powered loans or funded by Upstart's balance sheet."

56.     The 2021 10-K further stated that for the 2021 fiscal year, "16% of the loans funded through our platform were retained by the originated bank and 80% of loans were purchased by institutional investors through our loans funding programs."

57.     The 2021 10-K also highlighted Upstart's AI capability as "central to [the Company's] value proposition and unique position in the industry" because it "incorporate[s] more than 1,500 variables [and] ha[s] been trained by more than 21.6 million repayment events."

58.     Upstart filed a Schedule 14A proxy statement with the SEC on April 5, 2022 ("Proxy Statement"), which was solicited by Defendants Huber, Cassidy, Terry, Hentges, Schwartz, O'Kelly, Girouard, and Gu. The Proxy Statement was filed in accordance with Section 14(a) of the Exchange Act and contained material misstatements and omissions of fact.

59.     The Proxy Statement asked Upstart shareholders to (i) re-elect Defendants Cassidy and Gu to the Board of Directors and (ii) approve, on an advisory vote, the frequency of future stockholder advisory votes on Upstart's named executive officers' compensation, among other things.

60.     The Proxy Statement also outlined the obligations and responsibilities of the Audit Committee as well as the Board of Director's direct role in "Risk Oversight." In respect to the Board's risk obligations, the Proxy Statement provided:

We have designed and implemented processes to manage risk and our operations. Management is responsible for the day-to-day oversight and management of strategic, operational, legal and regulatory compliance, cybersecurity, and financial risks, while our Board, as a whole and assisted by its committees, has responsibility for the oversight of our risk management framework, which is designed to identify, assess, and manage risks to which our company is exposed. Consistent with this approach, our Board regularly reviews our strategic and operational risks in the context of discussions with management, question and answer sessions, and reports from the management team at each regular board meeting. Our board also receives regular reports on all significant committee activities at each regular board meeting and evaluates the risks inherent in significant transactions.

61.     The Proxy Statement also provided the responsibilities for the Board's committees in risk oversight and management:

In addition, our Board has tasked designated standing committees with oversight of certain categories of risk management. Our audit committee assists our board in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures, as well as legal and regulatory compliance and potential conflicts of interest. The audit committee also oversees our enterprise risk-management program, as well as our initiatives related to cybersecurity. Further, our audit committee, among other things, discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our compensation committee assesses risks relating to our executive compensation plans and arrangements. Our nominating and corporate governance committee assesses risks related to our corporate governance practices and the independence of the board. Our board believes its current leadership structure supports the risk oversight function of the board.

62.     Under the guidance, direction, and oversight of the Individual Defendants, the Proxy Statement failed to disclose, *inter alia*: (1) that the Audit Committee was failing in its duties and responsibilities, which were the same duties and responsibilities proclaimed to have been followed in the same Proxy Statement; and (2) while the Proxy Statement stated the Board

diligently oversaw risk management, the Board had in fact neglected its oversight function, thereby enabling the Individual Defendants' misconduct and further breach of their fiduciary duties.

63.     The above statements in ¶¶ 43–61 were false and misleading because they failed to disclose materially adverse information about Upstart's business, operations, and prospects. Specifically, the Individual Defendants, among other things, failed to disclose that: (1) the Company's AI loan underwriting model lacked the ability to account for relevant considerations that impacted creditworthiness; (2) consequently, the Company's conversion rate suffered; (3) Upstart also began heavily relying on its balance sheet to finance loans, thereby exposing it to high credit risk; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Upstart's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

64.     On May 9, 2022, after the market closed, the Company issued a press release revealing its financial results for the first quarter of 2022 ended March 31, 2022, alongside forecasts for the second quarter of 2022 and the fiscal year 2022. In the release, Upstart chopped its fiscal year 2022 forecast to revenue of $1.25 billion and a contribution margin of 48%. The press release also contained Upstart's Consolidated Balance Sheet for the first quarter of 2022, which stated the loans on Upstart's balance sheet more than doubled in only one quarter, ballooning from $252.5 million for the quarter ended December 31, 2021 to approximately $598 million for the quarter ended March 31, 2022.

65.     During the conference call with investors and analysts discussing the financial results for the first quarter of 2022, Defendant Girouard admitted Upstart "observed more volatility" in loans financed by banks and investors. He blamed the "volatility" on "the abrupt

termination of [government] stimulus programs [which] caused some of the more recent vintages to underperform."

66.     Later in the call, Defendant Datta explained that Upstart's balance of loans, notes, and residuals at the end of the quarter was…up to $604 million from $261 million in Q4." Defendant Datta attributed these sharp increases to the general economy, specifically blaming "rising interest rates and rising consumer delinquencies [as] putting downward pressure on conversion." He went on to admit that the Company "started to selectively use [its] capital as a funding buffer for core personal loans in periods of interest rate fluctuation where the market clearing price is in flux." Defendant Datta also recognized that the rise in loans on Upstart's balance sheet was because of "loan default rates" from the "two or three vintages" of loans after the end of the COVID stimulus program.

67.     Defendant Datta further admitted that "it would be fair to say that our platform, its ability to react to the new market-clearing price, it's probably not as nimble as we would like." He further revealed that the AI system is "somewhat manual" and "requires a bunch of conversations and phone calls."

68.     On this news, the price of the Company's stock sank by over 56%, falling from $77.13 per share at the close of trading on May 9, 2022, to $33.61 per share at the close of trading on May 10, 2022.

69.     On May 10, 2022, David Chiaverini, an analyst from Wedbush, stated that "[w]hile the Company claims that its decision to keep more loans on-balance sheet was used as a market clearing mechanism due to interest rate moves, we see this as a divergence3 from its capital-light business model and could indicate [the Company] has few alternatives other than to hold more loans due to funding issues."

70.     Shortly thereafter, on May 10, 2022, David Chiaverini referenced a Kroll Bond Rating Agency report on Upstart. The report stated that Kroll "now expects loss rates to be higher than previously expected for Upstart's pass-through securitizations issued in 2021." Chiaverini also stated that "Kroll now expects loss rates to be higher than previously expected for Upstart's pass-through trust securitizations issued in 2021."

## DAMAGES TO THE COMPANY

71.     As a direct and proximate result of the Individual Defendants' misconduct, Upstart has been seriously harmed and will continue to be harmed. The Company will be subject to vast expenditures including, but not limited to: (i) legal fees and expenses incurred in connection with the Class Action filed against Upstart and two of the Individual Defendants; (ii) any funds paid to settle the Class Action; (iii) costs incurred from the compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties to Upstart; and (iv) costs incurred from remedying the material weaknesses in Upstart's financial reporting internal controls.

72.     Additionally, due to the Individual Defendants' actions, Upstart's business, goodwill, and reputation with its industry partners, regulators, and stockholders have been gravely tarnished. For the foreseeable future, the Company will suffer from a "liar's discount" from the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

73.     By reason of their positions as officers and/or directors of the Company, each of the Individual Defendants owed and owe Upstart and its shareholders fiduciary obligations of care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage Upstart in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of Upstart's best interests and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Upstart and its shareholders

the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Upstart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of Upstart were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

75.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Upstart, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Upstart's Board at all relevant times.

76.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Upstart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of Upstart were required to exercise reasonable and prudent supervision over the management,

policies, practices, and controls of the financial behaviors of the Company. By virtue of such duties, the officers and directors of Upstart were required to, among other things:

(a)    Conduct the affairs of the Company in an efficient, business-like manner in a fashion that complies with all state and federal laws, including Upstart's own Code of Business Conduct and Ethics ("Code of Conduct");

(b)    Remain informed as to how Upstart conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make disclosures as necessary to comply with applicable laws;

(c)    Keep accurate records and reports of the business and internal affairs of Upstart and procedures for the reporting of the business and internal affairs to the Board and to investigate periodically, or cause independent investigation to be made of, said reports and records;

(d)    Manage internal legal, financial, and management controls, such that Upstart's operations comply with all applicable laws and Upstart's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate;

(e)    Ensure public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to publish are truthful and accurate; and

(f)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company and its stockholders.

**DERIVATIVE ALLEGATIONS**

77.     Plaintiff brings this action derivatively for the benefit of Upstart to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Upstart, as well as the aiding and abetting thereof. Upstart is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

78.     Plaintiff is, and has been at all relevant times, a stockholder of Upstart.  Plaintiff will adequately and fairly represent the interests of Upstart in enforcing and prosecuting its rights.

**DEMAND IS EXCUSED AS FUTILE**

79.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

80.     When this action was filed, Upstart's Board of Directors consisted of Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu (the "Director-Defendants"). Plaintiff did not make a demand on the Board to institute this action because such a demand would be futile. Plaintiff needs only to allege demand futility as to four of eight Director-Defendants that were on the Board at the time this action was filed.

81.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

82.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing Upstart to make the materially false and misleading

statements alleged herein.  Specifically, the Director-Defendants caused Upstart to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, demand would be futile, and thus excused, as the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

83.     **Defendant Huber** - Defendant Huber is and has been a director of Upstart since June 2021. Defendant Huber is also a member of the Nominating and Corporate Governance Committee. The Proxy Statement was solicited on his behalf, which contained false and misleading statements. As a trusted director, Defendant Huber failed to oversee Upstart's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls. As a result, Defendant Huber breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Huber is futile and excused.

84.     **Defendant Cooper** - Defendant Cooper is and has been a director of Upstart since March 2021. Defendant Cooper is also the Chair of the Compensation Committee. The Proxy Statement was solicited on her behalf, which contained false and misleading statements. As a trusted director, Defendant Cooper failed to oversee Upstart's scheme to make false and misleading statements and consciously disregarded her duties to monitor internal controls. As a result, Defendant Cooper breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Cooper is futile and excused.

85.     **Defendant Cassidy** – Defendant Cassidy is and has been a director of Upstart since February 2020. Defendant Cassidy is also a member of the Compensation Committee. The Proxy Statement was solicited on her behalf and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted director, Defendant Cassidy failed to

oversee Upstart's scheme to make false and misleading statements and consciously disregarded her duties to monitor internal controls.

86.      Defendant Cassidy also engaged in insider trading while in possession of material non-public information, which is a violation of federal law. From her insider trading, Defendant Cassidy reaped profits in excess of $1.1 million during a period where Upstart's stock price was artificially inflated because of the false and misleading statements outlined in this complaint.   As a result, Defendant Cassidy breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Cassidy is futile and excused.

87.      **Defendant Terry** - Defendant Terry is and has been a director of Upstart since February 2019. Defendant Terry is also the Chair of the Audit Committee. The Proxy Statement was solicited on his behalf, which contained false and misleading statements. As a trusted director, Defendant Terry failed to oversee Upstart's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls.

88.      Defendant Terry also engaged in insider trading while in possession of material non-public information, which is a violation of federal law. From his insider trading, Defendant Terry reaped profits in excess of $15.3 million during a period where Upstart's stock price was artificially inflated because of the false and misleading statements outlined in this complaint.   As a result, Defendant Terry breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Terry is futile and excused.

89.      **Defendant Hentges** - Defendant Hentges is and has been a director of Upstart since December 2019. Defendant Hentges is also a member of the Audit Committee. The Proxy Statement was solicited on her behalf, which contained false and misleading statements. As a

trusted director, Defendant Terry failed to oversee Upstart's scheme to make false and misleading statements and consciously disregarded her duties to monitor internal controls.

90.    Defendant Hentges also engaged in insider trading while in possession of material non-public information, which is a violation of federal law. From her insider trading, Defendant Hentges reaped profits in excess of $7.5 million during a period where Upstart's stock price was artificially inflated because of the false and misleading statements outlined in this complaint.   As a result, Defendant Hentges breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Hentges is futile and excused.

91.    **Defendant O'Kelly** - Defendant O'Kelly is and has been a director of Upstart since April 2018. Defendant O'Kelly is also a member of the Audit Committee and the Nominating and Corporate Governance Committee. The Proxy Statement was solicited on his behalf, which contained false and misleading statements. As a trusted director, Defendant O'Kelly failed to oversee Upstart's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls. As a result, Defendant O'Kelly breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant O'Kelly is futile and excused.

92.    **Defendant Girouard** - Defendant Girouard is and has been the CEO of Upstart since he co-founded the company. The Proxy Statement was solicited on his behalf, which contained false and misleading statements. As a trusted officer, Defendant Girouard failed to oversee Upstart's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls.

93.    Defendant Girouard also engaged in insider trading while in possession of material non-public information, which is a violation of federal law. From his insider trading, Defendant

Girouard reaped profits in excess of $207 million during a period where Upstart's stock price was artificially inflated because of the false and misleading statements outlined in this complaint.   As a result, Defendant Girouard breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Girouard is futile and excused.

94.   **Defendant Gu** – Defendant Gu is and has been the Senior Vice President of Product and Data Science of Upstart since April 2015. He is also a co-founder of Upstart. The Proxy Statement was solicited on his behalf, which contained false and misleading statements and led to his re-election to the Board. As a trusted director, Defendant Gu failed to oversee Upstart's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls.

95.   Defendant Gu also engaged in insider trading while in possession of material non-public information, which is a violation of federal law. From his insider trading, Defendant Gu reaped profits in excess of $143 million during a period where Upstart's stock price was artificially inflated because of the false and misleading statements outlined in this complaint.   As a result, Defendant Gu breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Gu is futile and excused.

96.   Additional reasons that demand on the Board is futile follow.

97.   Defendants Terry, Hentges, and O'Kelly (the "Audit Committee Defendants") were members of Upstart's Audit Committee during the Relevant Period. The Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do

under the Audit Committee Charter, allowing the Company to engage in improper accounting practices, to file false and misleading financial statements with the SEC, and to fail to maintain internal controls. Thus, demand upon the Audit Committee Defendants is excused.

98.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty. In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto.   Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

99.     Upstart has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Upstart any part of the damages Upstart suffered and will continue to suffer thereby.   Thus, any demand upon the Director-Defendants would be futile.

100.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.   Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).   As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this

action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

101.     The acts complained of herein constitute violations of fiduciary duties owed by Upstart's officers and directors, and these acts are incapable of ratification.

102.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### *Against the Director-Defendants for Violations of Section 14(a) of the Exchange Act*

103.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

104.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

105.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

106.    Under the guidance, direction, and oversight of the Director-Defendants, the Proxy Statement failed to disclose, *inter alia*: (1) that the Audit Committee was failing in its duties and responsibilities, which were the same duties and responsibilities proclaimed to have been followed in the same Proxy Statement; and (i2) while the Proxy Statement stated the Board diligently oversaw risk management, the Board had in fact neglected its oversight function, thereby enabling the Individual Defendants' misconduct and further breach of their fiduciary duties.

107.    Additionally, under the guidance, direction, and oversight of the Director-Defendants, the Proxy Statement failed to disclose, *inter alia*: (1) the Company's AI loan underwriting model lacked the ability to account for relevant considerations that impacted creditworthiness; (2) consequently, the Company's conversion rate suffered; (3) Upstart also began heavily relying on its balance sheet to finance loans, thereby exposing it to high credit risk; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Upstart's public statements were materially false and misleading at all relevant times.

108.    In the exercise of reasonable care, the Director-Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including but not limited to, the election of directors.

109.    The Company was damaged as a result of the Director-Defendants' material misrepresentations and omissions in the Proxy Statement.

110.    Plaintiff, on behalf of Upstart, has no adequate remedy at law.

## SECOND CLAIM

### *Against the Individual Defendants for Breach of Fiduciary Duties*

111.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

112.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Upstart's business and affairs.

113.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

114.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Upstart.

115.    In breach of their fiduciary duties owed to Upstart, the Individual Defendants willfully or recklessly caused Upstart to make false and misleading statements and/or omissions of material fact that failed to disclose that: Furthermore, the Proxy Statement failed to disclose that: (1) the Company's AI loan underwriting model lacked the ability to account for relevant considerations that impacted creditworthiness; (2) consequently, the Company's conversion rate suffered; (3) Upstart also began heavily relying on its balance sheet to finance loans, thereby exposing it to high credit risk; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Upstart's public statements were materially false and misleading at all relevant times.

116.    As a result of the foregoing, Upstart's public statements were materially false and misleading at all relevant times.

117.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

118.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

119.    Further in breach of their fiduciary duties, during the Relevant Period, five of the Individual Defendants engaged in insider trading, netting proceeds of approximately $375 million.

120.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Upstart's securities.

121.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Upstart's securities.

122.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Upstart has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

124.    Plaintiff on behalf of Upstart has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Upstart, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Upstart;

(c)    Determining and awarding to Upstart the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Upstart and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Upstart and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board;

     2.  a proposal to eliminate the current staggered Board election procedures;

     a provision to permit the shareholders of Upstart to nominate at least four candidates for election to the board; and

     3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

     (e)     Awarding Upstart restitution from the Individual Defendants, and each of them;

     (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     (g)     Granting such other and further relief as the Court may deem just and proper.

Dated: February 3, 2023

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*